# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3125

_____

| | | |
|---|---|---|
| Betty Vargo-Schaper, individually and, | * | |
| as Trustee for the Heirs of Mitchell | * | |
| E. Schaper, Deceased | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Weyerhaeuser Company, | * | |
| | * | |
| Defendant and Third Party | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Fil-Mor Express, Inc., | * | |
| Third Party Defendant. | * | |
| | * | |

_____

Submitted: May 13, 2010
Filed:  August 9, 2010

_____

Before BYE, MELLOY, and SHEPHERD, Circuit Judges.

_____

BYE, Circuit Judge.

Betty Vargo-Schaper appeals the district court's[1] grant of summary judgment in favor of Weyerhaeuser Company ("Weyerhaeuser"), on Vargo-Schaper's negligence claim. Vargo-Schaper contends there was sufficient evidence of negligence to submit the case to a jury. We affirm the district court's grant of summary judgment in favor of Weyerhaeuser.

I

Mitchell Schaper was a truck driver for Fil-Mor Express, Inc. (Fil-Mor), a commercial carrier which provided services to Weyerhaeuser by transporting Weyerhaeuser's cardboard-boxes from its manufacturing facility in White Bear Lake, Minnesota. On February 22, 2007, Schaper arrived at Weyerhaeuser's facility to pick up a load of cardboard-box bundles. A cardboard-box bundle is a large square unit consisting of flattened cardboard-boxes for transportation purposes. Fifty-two total bundles were loaded onto Schaper's trailer.

Weyerhaeuser employees loaded the boxes onto Schaper's trailer, placing the bundles on pallets two high, two wide. The bundles of boxes were not secured to the pallets. Typically, after a Weyerhaeuser employee loads a trailer, a Fil-Mor employee, or "spotter," pulls the trailer away from the loading dock and inspects the load. After inspection, the Fil-Mor spotter closes the trailer doors. Richard Thompson, the spotter for Fil-Mor on duty on February 22, 2007, indicated while it was his job to check the load for stability, it was also the driver's responsibility to inspect the load.

Schaper then transported the load to All-Temp, a warehouse facility, located eleven miles from Weyerhaeuser's facility. Generally, drivers arriving at All-Temp back their trailers towards the loading dock, stopping to open the trailer doors

---

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

approximately twenty feet from the unloading area. Todd Strandmark, a warehouse worker at All-Temp, had witnessed Schaper make deliveries to All-Temp for a number of years. On the day of the incident, Strandmark observed a bundle laying on the ground, approximately three to four feet from the doors of Schaper's trailer, after Schaper parked his truck to open the doors. This bundle, when loaded into the trailer, would have been approximately ten to eleven feet off the ground, contained six hundred boxes and weighed approximately 372 pounds. According to Strandmark, the bundle that fell was "actually a fairly flat sided bundle," and the bundles remaining in the trailer were "tight and uniform."

Initially, Strandmark believed Schaper left his truck to report the fallen bundle to All-Temp personnel. However, after failing to find Schaper inside All-Temp, Strandmark discovered Schaper unconscious in the cab of his truck. Schaper died on March 15, 2007, from the injuries sustained on February 22, 2007. Vargo-Schaper claims Schaper was struck by the falling bundle when he opened his trailer doors at All-Temp which lead ultimately to his death.

Ryan Steen, the site manager at the Weyerhaeuser facility, testified a crown can form at the top of the bundled cardboard-boxes after they are banded together. As a result, the banded bundle would not form an exact cube, and shifting or tipping could occur as a result in transit. Weyerhaeuser employees were instructed to load trucks to minimize the likelihood of shifting or tipping of the load. Steen looked at the bundle which fell after the accident and believed the bundle to be flat and stable. Gregory Klein, who worked on occasion as a spotter for Fil-Mor, testified he would inspect the load to ensure the right product was loaded and to see how it was organized. Although he would not physically shake the contents of the trailer, he indicated "you could see if things look stable" or if the load was too close to the door so as to be a safety concern.

Vargo-Schaper filed a lawsuit against Weyerhaeuser for negligence in the accident which lead to the death of her husband. Vargo-Schaper contended Schaper died because of Weyerhaeuser's negligent loading of the trailer which Schaper drove. Weyerhaeuser removed the case to federal court based on diversity of citizenship.

The district court granted summary judgment for Weyerhaeuser because Vargo-Schaper did not present evidence of a latent loading defect which would have made Weyerhaeuser liable for the death of Schaper and because the doctrine of *res ipsa loquitur* did not apply in this case. Vargo-Schaper appeals, contending the issue of whether there were loading defects is a question of fact for a jury to decide and the doctrine of *res ipsa loquitur* applies in this case.

## II

This court reviews the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party. Lake v. Yellow Transp., Inc., 596 F.3d 871, 873 (8th Cir. 2010). Summary judgment is proper if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Because this is a diversity action, we apply Minnesota law to resolve the issue. Gylten v. Swalboski, 246 F.3d 1139, 1141 (8th Cir. 2001). In Minnesota, a plaintiff must establish the following to prevail on a claim for negligence: "(1) that the defendant has a legal duty to the plaintiff to take some action; (2) that there was a breach of that duty; (3) that the breach of that duty was the proximate cause of the harm to the plaintiff; and (4) damage." Id. (citing Gilbertson v. Leininger, 599 N.W.2d 127, 130 (Minn. 1999)).

## A. Duty

Common carriers, such as Fil-Mor, are subject to the Federal Motor Carrier Safety Regulations. 49 C.F.R. § 390.5. These regulations impose a duty of ensuring load security upon the carrier. 49 C.F.R. §§ 390-393. The Fourth Circuit established the prevailing law followed by most jurisdictions for the duties of shippers and common carriers:

> The primary duty as to the safe loading of property is therefore upon the carrier. When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper.

United States v. Savage Truck Line, Inc., 209 F.2d 442, 445 (4th Cir. 1954). The Savage rule therefore imposes liability on carriers even if the shippers negligently loaded the cargo, except where the shippers' "negligence was undiscoverable through a reasonable safety inspection." Decker v. New England Pub. Warehouse, Inc., 749 A.2d 762, 767 (Me. 2000).

The policy behind the Savage rule reflects the practice and understanding in the trucking industry as to carriers having final responsibility for the loads they haul. Id. at 766. As a result, the carrier has the opportunity, as well as the obligation under federal law, to conduct a safety inspection of its cargo. Id. at 767. See 48 C.F.R. 392.9 (providing drivers must inspect cargo and secure their load before operating the vehicle).

Weyerhaeuser had a duty of care to Schaper to prevent latent loading defects under the Savage rule. Weyerhaeuser did not have a duty however, to prevent or

correct any open or obvious loading defect. Accordingly, the burden is on Vargo-Schaper to present evidence of a latent defect to overcome summary judgment.

**B. Breach of Duty**

Vargo-Schaper argues the question of whether a defect in loading is obvious or concealed, and thus, whether Weyerhaeuser breached its duty of care, is a question of fact for the jury. Vargo-Schaper contends the crowning effect on the bundles of cardboard-boxes, which caused the load to be unstable, was a latent defect. In addition, Vargo-Schaper alleges the placement of the heaviest bundles near the truck door by Weyerhaeuser employees was a latent defect because Schaper could not tell which bundle was the heaviest by looking into the trailer.

Viewing the evidence in the light most favorable to Vargo-Schaper, as we are required to do on summary judgment, we assume the accident was caused by Weyerhaeuser's negligence in loading the trailer. Notwithstanding that fact, no reasonable jury could conclude the loading defect was latent and not discoverable by Schaper upon inspection. In analyzing whether a defect is latent, a primary factor viewed by many courts is the amount of experience possessed by the driver. See White v. Dietrich Metal Framing, No. 1:06-CV-554, 2007 WL 7049797, at *7 (E.D. Tex. July 5, 2007) ("While it is clear that an unobservable defect is a latent defect and a readily apparent defect is a patent defect, the latent or patent nature of such defect may depend in some measure upon the experience of the observer.") (internal quotation marks and citation omitted); Alitalia v. Arrow Trucking Co., 977 F.Supp. 973, 984 (D. Ariz. 1997) ("What is patent may depend in part upon the experience of the observer."). It stands to reason drivers with more experience are more capable of detecting loading defects than those without experience. Smith v. N. Dewatering, Inc., No. Civ. 01-1948 JNERLE, 2004 WL 326696, at *3 (D. Minn. Feb. 19, 2004) (unreported) ("Given [the truck driver's] experience, the [defect] was readily discernible from his ordinary observation.").

Similarly, courts have looked at whether the shipper provided any assurances regarding the safety of the load to the driver, which detracts from the open and obvious nature of the defect. Franklin Stainless Corp. v. Marlo Transp. Corp., 748 F.2d 865, 870 (4th Cir. 1984) (concluding the trucker's lack of knowledge about the defect in loading and reasonable reliance on assurances of safety distinguished the case from Savage); Grantham v. Nucor Corp., No. 2:07-CV-229 TS, 2008 WL 3925211, at *3 (D. Utah Aug. 20, 2008) (unreported) (finding the defects were latent where the plaintiff had never hauled products from the facility before and was told by the shipper that the height of the load, which was the defect at issue, was safe to be driven).

In this case, neither of these factors apply because Schaper had years of experience driving for Fil-Mor, including much experience handling loads from Weyerhaeuser, and there is no evidence Weyerhaeuser provided any assurances regarding the safety of the load. In addition, Gregory Klein, a spotter for Fil-Mor, testified he would inspect each load to ensure the right product was loaded and to see how it was organized. He stated he would not physically shake the load to check its stability, but "you can see if things look stable" or if the load was too close to the door to present a safety concern. This is confirmed by Steen and Strandmark, who both testified the bundle which fell from Schaper's truck was not bowed. Strandmark also stated the bundles which remained in the trailer were "tight and uniform." Under these circumstances, the district court did not err in concluding there was no latent defect due to the crowning effect of the bundles because any defect would have been visible upon inspection.

Similarly, the district court did not err in rejecting Vargo-Schaper's argument on the weight of the bundles. The burden is on the nonmoving party (Vargo-Schaper) to "come forward with specific facts showing that there is a genuine issue for trial." Matsuchita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)). The record when taken as a whole could not lead a

rational trier of fact to find in favor of Vargo-Schaper, and we will not speculate as to the dangerous nature of placing heavy bundles next to trailer doors. See Bob Useldinger & Sons, Inc. v. Hangsleben, 505 N.W. 2d 323, 328 (Minn. 1993) (holding "speculation, without some concrete evidence, is not enough to avoid summary judgment."). Based on this testimony above and the totality of the circumstances, it is equally plausible that the bundle became unstable for a number of different reasons during the eleven-mile transport from Weyerhaeuser's facility to All-Temp, among other possibilities. See Custom Rubber Corp. v. ATS Specialized, Inc., 633 F.Supp.2d 495, 510 (N.D. Ohio 2009) (holding there was no affirmative evidence a loading defect caused the trailer to tip because there were numerous possibilities that could have caused the accident, such as taking a turn too fast). Therefore, the district court did not err in determining there was not any latent defect.

## C. Res Ipsa Loquitur

Finally, Vargo-Schaper contends there are sufficient facts to invoke the doctrine of *res ipsa loquitur* because the events could not have occurred in the absence of Weyerhaeuser's negligence. *Res ipsa loquitur*, translated as "the thing or situation speaks for itself," exists "to assist plaintiff in discharging his obligation to make out a prima facie case of negligence and to aid the jury in performing its fact finding function." Stelter v. Chiquita Processed Foods, L.L.C., 658 N.W.2d 242, 246-47 (Minn. Ct. App. 2003) (citing Olson v. St. Joseph's Hosp., 281 N.W.2d 704, 708 (Minn. 1979)). Under Minnesota law, *res ipsa loquitur* requires three elements:

> (1) The event must be of a kind which ordinarily does not occur in the absence of someone's negligence;
> (2) It must be caused by an agency or instrumentality within the exclusive control of the defendant; and
> (3) It must not have been due to any voluntary action or contribution on the part of the plaintiff.

Warrick v. Giron, 290 N.W.2d 166, 169 (Minn. 1980); Mattke v. Deschamps, 374 F.3d 667, 670 (8th Cir. 2004). The district court concluded Vargo-Schaper failed to put forth any evidence establishing Weyerhaeuser's exclusive control over Schaper's load because both a Fil-Mor spotter and Schaper exerted control over the load prior to the accident. In addition, the district court noted there was no evidence Schaper himself did not contribute to his injuries through the driving of his truck. We agree.

First, the load was not within Weyerhaeuser's exclusive control. See Depositors Ins. Co v. Wal-Mart Stores, Inc. 506 F.3d 1092, 1096 (8th Cir. 2007) ("*Res ipsa loquitur* depends upon the defendant's complete and exclusive control of the instrumentalities that cause the injury.") (internal quotation marks and citation omitted). "In ordinary parlance, 'exclusive control' connotes that no other person or entity had any control over the instrumentality which caused the damage." Mahowald v. Minn. Gas Co., 344 N.W.2d 856, 862 (Minn. 1984). Here, Fil-Mor spotters were tasked with inspecting cargo loaded by Weyerhaeuser, as well as pulling the trucks from the loading docks, closing the trailer doors, and applying a plastic seal to the doors. While Weyerhaeuser placed the bundles on Schaper's truck, the spotter maintained control over these elements of the loading process which detracts from a finding of exclusive control by Weyerhaeuser.

Second, there remain other possible causes of Schaper's injury which are not reasonably excluded by the evidence. "When the injury could have been caused with substantially equal probability from other causes as well as any acts of defendants, facts, other than just the fact of injury itself from which defendant's negligence may be inferred, must exist before a *res ipsa loquitur* issue can be submitted to the jury."9 Hoven v. Rice Mem'l Hosp., 396 N.W.2d 569, 572 (Minn. 1986). Schaper may have shifted the bundle when he drove from Weyerhaeuser to All-Temp, or he may have dislodged the bundle upon opening the trailer door in some fashion. Under these circumstances, *res ipsa loquitur* is not appropriate because other reasonable possible causes of the injury remain. Owen v. Gen. Motors Corp., 533 F.3d 913, 923 (8th Cir.

2008) (stating the inference under *res ipsa loquitur* may be drawn if there is evidence tending to eliminate other possible causes).

## III

Vargo-Schaper has failed to establish a breach of duty on the part of Weyerhaeuser, therefore her negligence claim cannot be established and *res ipsa loquitur* does not apply to this case. Accordingly, we affirm the district court's grant of summary judgment in favor of Weyerhaeuser.

_____